| | |
|---|---|
| NATIONAL ASSOCIATION FOR STOCK CAR AUTO RACING, LLC,<br><br>Plaintiff,<br><br>v.<br><br>THE INDIVIDUALS, CORPORATIONS, LIMITED LIABILITY COMPANIES, PARTNERSHIPS, AND UNINCORPORATED ASSOCIATIONS IDENTIFIED ON SCHEDULE A TO THE COMPLAINT,<br><br>Defendants. | Civil Action No. |

## DECLARATION OF MEGAN MALAYTER

I, Megan Malayter, declare as follows:

1.      My name is Megan Malayter. I am the Vice President, Licensing and Consumer Products for National Association for Stock Car Auto Racing, LLC, the Plaintiff in the above identified action, and I am authorized to make this declaration on its behalf.

2.      This declaration is based upon my personal knowledge of the facts stated herein or on the business records that were made at the time or in the regular course of business. If called as a witness, I could and would testify to the statements made herein.

3.      Plaintiff, National Association for Stock Car Auto Racing, LLC ("NASCAR"), acts as the sales, marketing, design and distribution arm of NASCAR brand products worldwide.

4.      NASCAR is in the business of developing, marketing, selling, distributing, and licensing NASCAR-branded products and services. Founded in 1948, NASCAR is the foremost stock car and stock truck racing sanctioning body in North America. Each year, NASCAR sanctions over 1,500 races at over 100 tracks in 48 U.S. states, as well as in Canada, Mexico, Brazil, and

1

Europe. Through its affiliates and partners (including its partner Fanatics, which operates the NASCAR Shop) NASCAR sells, markets, designs, distributes, and licenses NASCAR-branded products worldwide.

5. National Association for Stock Car Auto Racing, LLC is the owner of U.S. Trademark Registration Nos. 1,850,527; 1,908,112; 2,885,737; 4,289,440; 5,388,088; 5,578,788; 6,196,869; and 7,374,941 (collectively the "NASCAR Marks").

6. The above registrations for the NASCAR Marks are valid, subsisting, and in full force and effect.

7. The NASCAR Marks are distinctive and identify the merchandise as goods from National Association for Stock Car Auto Racing, LLC.

8. The NASCAR Marks have been continuously used and never abandoned.

9. NASCAR has expended substantial time, money, and other resources in developing, advertising, and otherwise promoting the NASCAR Marks. As a result, products associated with the NASCAR Marks are recognized and exclusively associated by consumers, the public, and the trade as being products sourced from National Association for Stock Car Auto Racing, LLC.

10. The success of the NASCAR brand has resulted in its significant counterfeiting. Consequently, NASCAR is implementing an anti-counterfeiting program and is investigating suspicious websites and online marketplace listings identified through external vendors in proactive Internet sweeps. NASCAR has identified numerous individual, fully interactive Internet commercial websites and marketplace listings on online third-party platforms, including the one identified in Schedule A attached to the Complaint (the "Seller Aliases"), which are offering for sale, selling, and importing counterfeit products in connection with NASCAR's federally registered

2

NASCAR Marks (the "Infringing Products") to consumers in this Judicial District and throughout the United States.

11.     I perform, supervise, and/or direct investigations related to Internet-based infringement of the NASCAR Marks. Our investigation shows that defendants use Internet stores to sell Infringing Products from foreign countries including China to consumers in the U.S. and elsewhere. I, or someone working under my direction, analyzed the Seller Aliases and determined that Infringing Products were being offered for sale to the United States, including New York. This conclusion was reached through visual inspection of the products listed for sale on the Seller Aliases, the price at which the Infringing Products were offered for sale, other features commonly associated with websites selling counterfeit products, the ability to ship to the United States, including New York, and because Defendants and their Internet Stores do not conduct business with NASCAR and do not have the right or authority to use the NASCAR Marks for any reason. True and correct copies of screenshot printouts showing the active Seller Aliases reviewed are attached as Exhibit 2 to the Complaint.

12.     Upon information and belief, Defendants facilitate sales by designing the Seller Aliases so that it appears to unknowing consumers to be an authorized online retailer, outlet store or wholesaler selling genuine NASCAR brand products. The Seller Aliases look sophisticated and accepts payment in U.S. dollars via credit cards, PayPal, and others. The Seller Aliases include images and design elements that make it very difficult for consumers to distinguish it from an authorized seller's website. Defendants further perpetuate the illusion of legitimacy by using indicia of authenticity and security that consumers have come to associate with authorized retailers, including the AmEx®, Apple Pay®, Visa®, MasterCard®, and PayPal® logos. NASCAR has not

licensed or authorized Defendants to use its NASCAR Marks, and Defendants are not an authorized retailer of genuine NASCAR products.

13. Upon information and belief, Defendants also deceive unknowing consumers by using the NASCAR Marks without authorization within the content, text, and/or meta tags of the Seller Aliases in order to attract various search engines crawling the Internet looking for websites relevant to consumer searches for NASCAR products. Additionally, upon information and belief, Defendants use other unauthorized search engine optimization (SEO) tactics and social media spamming so that the Seller Aliases' listings show up at or near the top of relevant search results and misdirect consumers searching for genuine NASCAR products. Further, from experience, we have seen that others similar to the Defendants utilize similar illegitimate SEO tactics to propel new listings to the top of search results after others are shut down.

14. Defendants have gone to great lengths to conceal their identities and often provide only an email address and telephone number as contact information, which are often found to be fake. Counterfeiters often use specialized services that conceal the owners' identity, contact information and Internet IP addresses. Upon information and belief, counterfeiters regularly create new internet stores on various platforms. Counterfeit website registration patterns are one of many common tactics used by counterfeiters and knockoff sellers, like the Defendants, to conceal their identities, the full scope and interworking of their counterfeiting operation, and to avoid being shut down.

15. Based on my investigation and comparison of the Seller Aliases, even though Defendants operate under multiple fictitious names, there are numerous similarities among the Defendants' Seller Aliases. For example, many of the Defendant Seller Aliases have virtually identical layouts, even though different aliases were used to register the respective domain names.

In addition, Counterfeit and/or Infringing NASCAR Products for sale in the Defendant Seller Aliases bear similar irregularities and indicia of being counterfeit to one another, suggesting that the Counterfeit and/or Infringing NASCAR Products were manufactured by and come from a common source and that, upon information and belief, Defendants are interrelated. The Defendants' Seller Aliases also include other notable common features, including use of the same Internet Store registration patterns, unique product listing description and layouts, accepted payment methods, check-out methods, meta data, illegitimate SEO tactics, HTML user- defined variables, domain redirection, lack of contact information, identically or similarly priced hosting services, similar name servers, and the use of the same text and images.

16. In addition to operating under fictitious names, Defendants in this case and defendants in other similar cases against online counterfeiters use a variety of other common tactics to evade intellectual property enforcement efforts. For example, counterfeiters like Defendants will often register new Internet Stores under new aliases once they receive notice of a lawsuit. Counterfeiters will also often move website hosting to rogue servers located outside the United States once notice of a lawsuit is received. Rogue servers are notorious for ignoring take down demands sent by intellectual property owners. Counterfeiters also typically ship products in small quantities via international mail to minimize detection by U.S. Customs and Border Protection.

17. Counterfeiters such as Defendants typically operate multiple credit card merchant accounts as well as third-party online marketplace platform accounts behind layers of payment gateways so that they can continue operation in spite of NASCAR's enforcement efforts. Upon information and belief, counterfeiters such as Defendants maintain off-shore bank accounts and regularly move funds from their credit card merchant accounts and third-party online marketplace platform accounts to off-shore bank accounts outside the jurisdiction of this Court.

18. Monetary damages alone cannot adequately compensate NASCAR for this ongoing infringement because monetary damages fail to address the loss of control of and damage to NASCAR's reputation and goodwill. Furthermore, monetary damages are difficult, if not impossible, to completely ascertain due to the inability to fully quantify the monetary damage caused to NASCAR's reputation and goodwill by acts of infringement.

19. NASCAR's goodwill and reputation are irreparably damaged when the NASCAR Marks are used in connection with goods not authorized, produced, or manufactured by National Association for Stock Car Auto Racing, LLC. Moreover, consumer brand confidence is damaged, which can result in a loss of future sales and market share. The extent of harm to NASCAR's reputation and goodwill and the possible diversion of customers due to loss in brand confidence are largely unquantifiable.

20. NASCAR is further irreparably harmed by the unauthorized use of the NASCAR Marks because counterfeiters take away NASCAR's ability to control the nature and quality of products used with the NASCAR Marks. Loss of quality control over goods using the NASCAR Marks and, in turn, loss of control over our reputation is neither calculable nor precisely compensable.

21. The sale of Infringing Products using the NASCAR Marks also causes consumer confusion, which weakens the NASCAR brand's recognition and reputation. Consumers who mistakenly believe that the Infringing Products they have purchased originated from NASCAR will come to believe that NASCAR offers low- quality products. Inferior quality products will result in increased skepticism and hesitance in consumers presented with genuine NASCAR brand products, resulting in a loss or undermining of NASCAR's reputation and goodwill. Furthermore, Infringing

Products, primarily coming from China can be extremely dangerous and present alarming safety hazards to children.

22.     NASCAR is further irreparably damaged due to a loss in exclusivity. The NASCAR products are meant to be exclusive. NASCAR's extensive marketing and distribution of NASCAR products are aimed at growing and sustaining sales of NASCAR Products. The NASCAR Marks are distinctive and signify to consumers that the products originate from NASCAR and are manufactured to NASCAR's high-quality standards. When counterfeiters use the NASCAR Marks on goods without NASCAR's authorization, the exclusivity of NASCAR's NASCAR products, as well as NASCAR's reputation, are damaged and eroded, resulting in a loss of unquantifiable future sales.

23.     NASCAR will suffer immediate and irreparable injury, loss, or damage if an ex parte Temporary Restraining Order is not issued in accordance with Federal Rule of Civil Procedure 65(b)(1).

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on March 31, 2026.

_____
Megan Malayter